**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 19, 2021**

# In the Court of Appeals of Georgia

A21A1600. MCNEIL V. THE STATE.

BARNES, Presiding Judge.

Following the grant of his application for interlocutory appeal, Carl W. McNeil appeals from the trial court's order denying his motion to suppress evidence seized from his person during a traffic stop. McNeil contends that the officer who conducted the traffic stop violated his Fourth Amendment rights by impermissibly prolonging the stop beyond the time required to fulfill its purpose without having a reasonable articulable suspicion of other illegal activity. McNeil further contends that the pat-down search of his person conducted by the officer violated the Fourth Amendment because the officer did not have a reasonable belief that he was armed and dangerous. For the reasons discussed below, we reverse.

"When reviewing a trial court's ruling on a motion to suppress, an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." (Citation and punctuation omitted.) *State v. Allen*, 298 Ga. 1, 2 (1) (a) (779 SE2d 248) (2015). In conducting its review, "an appellate court generally must limit its consideration of the disputed facts to those expressly found by the trial court." *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). "An appellate court may, however, consider facts that definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape." (Citation and punctuation omitted.) *Caffee v. State*, 303 Ga. 557, 559 (1) (814 SE2d 386) (2018). See *Allen*, 298 Ga. at 2. Viewed in this light, the evidence introduced at the suppression hearing, which included the law enforcement officer's testimony and the audio and visual footage of the traffic stop recorded by his body camera, reflects the following.

On March 20, 2019, at 10:41 p.m., a sergeant with the Grantville Police Department was on patrol on I-85 when he saw a sedan with a Florida tag following too closely behind another vehicle. The sergeant initiated a traffic stop, and the sedan pulled over on an exit ramp. After exiting his patrol car, the sergeant approached the

2

sedan and saw that there were two occupants – a female driver and a male front seat passenger, McNeil.

While standing at the driver's side window, the sergeant asked the driver for her license and inquired whether the vehicle belonged to her, and she handed her Florida license to the sergeant and informed him that the sedan was a rental in her name. The sergeant explained to the driver the reason for the traffic stop and asked to see the rental agreement, which the driver handed to the sergeant after she and McNeil rummaged through the sedan. The sergeant asked if there were any weapons inside the sedan, and the driver and McNeil said that there were not. At the sergeant's request, McNeil also handed his Florida license to the sergeant. According to the sergeant, McNeil seemed very nervous.

Approximately four minutes into the traffic stop, the sergeant informed the driver that he planned to issue her a written warning for the traffic violation and asked her to walk with him to his patrol car, and she complied. While walking to the patrol car, the sergeant asked the driver if there was a reason she was driving so closely to the other vehicle, and she explained that she owned an organic soy candle-making company and was tired because she and her boyfriend, McNeil, had driven from Pensacola, Florida, to deliver some candles. The sergeant testified that he found her

3

story suspicious because, in his experience with drug interdiction, he had become aware of people concealing drugs inside candles and then melting off the wax.

While the driver remained beside the patrol car, the sergeant ran her and McNeil's licenses through a crime record database and determined that there were no outstanding warrants or license issues. Approximately six minutes had elapsed since the beginning of the traffic stop.

After checking the licenses, the sergeant exited his patrol car and told the driver to pay more attention while driving. The sergeant, who continued to hold the licenses and rental agreement, then asked the driver how long she and McNeil had been gone that day. The driver replied that they had left Pensacola that morning and had been in Atlanta around 5:00 pm. According to the sergeant, he spoke with the driver after running the licenses to make sure she was not impaired, and he observed no signs of impairment and decided not to conduct any field sobriety tests.

While speaking with the driver, the sergeant saw McNeil rummaging around inside the sedan. After the driver answered questions about her travel itinerary, the sergeant told her to stay by his patrol car while he went to speak with McNeil. Approximately seven minutes into the traffic stop, the sergeant then walked over to the passenger side of the sedan while continuing to hold the licenses and rental

4

agreement. During his subsequent questioning of McNeil, the sergeant unfolded the rental agreement and reviewed it, but he did not ask McNeil any specific questions about the agreement.

The sergeant confirmed with McNeil the information on his Florida license, which listed a Pensacola home address. The sergeant also asked McNeil where he and the driver were coming from, and McNeil said Atlanta. McNeil also said that he was riding with his girlfriend who had a candle business and was selling candles, and that they had left home that afternoon. The sergeant inquired if there were any weapons or anything illegal in the sedan, and McNeil said no. The sergeant then asked McNeil if he had ever been in trouble, and McNeil answered in the affirmative and said that his last offense was for being a "habitual driver" in Florida, but that he had not been in prison or in trouble for ten years.

Following his questioning of McNeil, the sergeant walked back over to the driver. At that point, it was approximately eight minutes into the traffic stop, and another officer had arrived on the scene. The sergeant did not start writing out a warning to the driver or return the licenses and rental agreement. Instead, the sergeant asked the driver if he could see the candle wax. The driver agreed, opened the car trunk, and showed the sergeant a black plastic bag full of wax. The driver also

5

answered additional questions about her candle business and travel itinerary in response to further questioning by the sergeant. The sergeant asked the driver if there was anything illegal inside the car, and she said no and offered to show him the website for her business. The sergeant then asked for consent to search the sedan, which the driver gave.

Before conducting the search of the sedan, approximately ten minutes into the traffic stop, the sergeant returned to the passenger side of the car and asked McNeil to step out and turn around. McNeil, who still appeared nervous to the sergeant, got out of the car but started to reach down. The sergeant told McNeil not to reach down and then patted him down for weapons. The sergeant later testified that he feared McNeil might have a weapon because of his criminal history, his nervousness, his rummaging through the car, and his reaching down to his pants. The sergeant also testified that he was concerned that a weapon might be present because of his suspicion that the candle business was a cover for drug trafficking.

During the pat-down, the sergeant felt a large bulge at McNeil's lower back. The sergeant handcuffed McNeil, who claimed that the bulge was a bag of marijuana. The sergeant retrieved the bag, which contained heroin. Cocaine was later discovered in McNeil's shoe.

McNeil was indicted on charges of trafficking in illegal drugs (heroin) and possession of cocaine. He moved to suppress the drugs, arguing that the sergeant violated his Fourth Amendment rights by unreasonably prolonging the traffic stop without reasonable suspicion of criminal activity and that the drugs were seized as the result of his unlawful detention. McNeil also argued that the pat-down search violated the Fourth Amendment because the sergeant did not have a reasonable belief that he was armed and dangerous.

Following the suppression hearing, the trial court denied the motion, determining that the sergeant's "actions all fit within the reasonable inquiry and investigation authority following a valid traffic stop." The trial court further concluded that even if the sergeant had prolonged the detention beyond the time necessary to complete the traffic stop, the sergeant was authorized to do so because he had a reasonable articulable suspicion of other criminal activity in light of McNeil's nervousness, the fact that sergeant had experience with candles being used in drug trafficking, and inconsistencies in the driver and McNeil's stories. The trial court also ruled that the pat-down search was lawful because the sergeant reasonably believed that McNeil might be armed and dangerous.

On appeal, McNeil does not challenge the validity of the initial traffic stop, but he argues that the trial court erred by finding that the sergeant did not impermissibly prolong it. In this regard, McNeil contends that the sergeant unreasonably prolonged the traffic stop beyond the time that was necessary to complete the purpose of the stop without having a reasonable articulable suspicion of other illegal activity.[1] We agree.

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U. S. 348, 354 (II) (135 SCt 1609, 191 LE2d 492) (2015). But a

> seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.

*Allen*, 298 Ga. at 4 (2) (a), quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (125 SCt 834, 160 LE2d 842) (2005). Hence, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic

---

[1] Although a passenger in the stopped vehicle, McNeil has standing to challenge his detention as part of the traffic stop and to seek the suppression of evidence obtained as a result of his alleged illegal detention. See *State v. McMichael*, 276 Ga. App. 735, 737 (1), n. 6 (624 SE2d 212) (2005).

violation that warranted the stop, and attend to related safety concerns." (Footnote omitted.) Id., quoting *Rodriguez*, 575 U. S. at 354 (II). "Whether a traffic stop was unreasonably prolonged 'may often be a fact-intensive determination, but it is ultimately a holding of constitutional law that we review de novo.'" *Flores v. State*, 347 Ga. App. 174, 177 (2) (818 SE2d 90) (2018), quoting *Allen*, 298 Ga. at 4 (2).

It is well-established that "officers may, without unreasonably prolonging a stop, ask the driver to step out of the vehicle; verify the driver's license, insurance, and registration; complete any paperwork connected with the citation or written warning; and determine if there are any outstanding warrants for the driver or the passengers." *Flores*, 347 Ga. App. at 177 (2). "With regard to rental cars, examination of the rental agreements and any ensuing investigation are considered part of the traffic stop." *Williams v. State*, 329 Ga. App. 650, 653 (766 SE2d 82) (2014). "While carrying out these tasks, an officer may ask the driver questions wholly unrelated to the traffic stop or otherwise engage in 'small talk' with the driver, so long as the questioning does not prolong the stop beyond the time reasonably required to complete the purpose of the traffic stop." (Citation and punctuation omitted.) *Sommese v. State*, 299 Ga. App. 664, 669 (1) (b) (683 SE2d 642) (2009). See *Flores*, 347 Ga. App. at 177 (2).

In light of this precedent, the sergeant did not unreasonably prolong the traffic stop by asking the driver to step out of the sedan, verifying the licenses of the driver and McNeil, checking to see that there were no outstanding warrants for the driver and McNeil, and reviewing the rental agreement. Nor did the sergeant unreasonably prolong the traffic stop by asking the driver and McNeil questions unrelated to the traffic violation when carrying out those tasks. But after completing those tasks and identifying no outstanding warrants or issues with the licenses or rental agreement, the only remaining task for the sergeant to carry out was to issue the written warning for following too closely. Yet, approximately eight minutes into the traffic stop, instead of issuing a written warning and allowing the driver and McNeil to leave, the sergeant walked over to the driver after speaking with McNeil and continued to extensively question her about her candle business.

"The United States Supreme Court has held unequivocally that the Fourth Amendment does not allow even a de minimis extension of a traffic stop beyond the investigation of the circumstances giving rise to the stop." *State v. Drake*, 355 Ga. App. 791, 793 (1) (845 SE2d 765) (2020) (per curiam), citing *Rodriguez*, 575 U. S. at 356-357 (II). And as the Supreme Court of Georgia has explained, "activities unrelated to the mission of the [traffic] stop must not extend the time of the stop at

10

all, and such a prolongation of the stop is not permissible even if those activities are done in the middle of the stop." *Allen*, 298 Ga. at 11 (2) (c). Thus, if an officer "clearly divert[s]" from conducting his traffic investigation to carry out a task unrelated to the mission of the stop, the traffic stop is unreasonably prolonged. Id. See *Bodiford v. State*, 328 Ga. App. 258, 263-264 (1) (761 SE2d 818) (2014) (officer unreasonably prolonged traffic stop, where officer diverted from communicating with dispatcher about results of license check to have his drug dog perform a free-air sniff around the defendant's car); *Nunnally v. State*, 310 Ga. App. 183, 186-187 (1) (713 SE2d 408) (2011) (officer unreasonably prolonged traffic stop, where officer "temporarily abandoned" investigation of traffic violation by contacting K-9 unit and having drug dog sniff the exterior of the car in lieu of starting to write a citation or warning for the traffic offense or communicating with dispatch about the driver's license information); *State v. Blair*, 239 Ga. App. 340, 342 (521 SE2d 380) (1999) (traffic stop unreasonably prolonged, where "officer abandoned [the] investigation [into the car's registration and licensing] and detained the occupants of the car in order to conduct a search for drugs"). That is the situation here, where the sergeant clearly diverted from the task of issuing a written warning citation and abandoned the traffic investigation to instead pursue further questioning of the driver about her

11

candle business, a matter entirely unrelated to the traffic stop. Accordingly, the traffic stop was prolonged beyond the time reasonably required to fulfill the mission of issuing the warning ticket for following too closely, and the trial court erred in concluding otherwise. See *Rodriguez*, 575 U. S. at 354-355 (II) ("[A] traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket.") (citation and punctuation omitted); *Weaver v. State*, 357 Ga. App. 488, 491 (851 SE2d 125) (2020) (detention was unreasonably prolonged, where officer continued to detain and question driver after tasks related to the traffic stop had been completed); *Bennett v. State*, 285 Ga. App. 796, 799 (648 SE2d 126) (2007) (detention was unreasonable, where, instead of giving a verbal or written warning to the driver, the officer continued to detain the driver and seek permission to search him and his car while waiting for another officer to arrive at the scene with a written warning book). See also *People v. Pulling*, 34 NE3d 1198, 1201 (Ill. App. 2015), cited with approval in *Allen*, 298 Ga. at 11 (2) (c) (traffic stop prolonged beyond the time reasonably required to fulfill mission of the stop where officer "interrupted his traffic citation preparation to conduct a free-air sniff").

Once "an officer prolongs the traffic stop beyond the time reasonably required to fulfill the initial purpose of the stop, . . . the continued detention of the vehicle and

12

its occupants amounts to a second detention," and, for the continued detention to pass constitutional muster, "the officer must have a reasonable articulable suspicion of other illegal activity." *Rogers v. State*, 323 Ga. App. 647, 650 (747 SE2d 213) (2013). Reasonable articulable suspicion

> must be based on more than a subjective, general suspicion or hunch. The detention must be justified by specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the detention, and the [officer] must have some basis from which the court can determine that the detention was neither arbitrary nor harassing.

(Citation, punctuation, and footnote omitted.) *Faulkner v. State*, 256 Ga. App. 129, 130 (567 SE2d 754) (2002). "To determine whether a reasonable articulable suspicion exists, courts must look to the totality of the circumstances." (Citation and punctuation omitted.) *Matthews v. State*, 330 Ga. App. 53, 56 (766 SE2d 515) (2014). "Whether a given set of facts rises to the level of reasonable[ ] articulable suspicion of criminal activity is a legal question." (Citation, punctuation, and footnote omitted.) *Jones v. State*, 253 Ga. App. 870, 873 (560 SE2d 749) (2002).

In the present case, the State argued that the sergeant was justified in prolonging the detention because he had a reasonable articulable suspicion of illegal

drug activity. The trial court agreed with the State, finding that the sergeant had articulated three reasons for his suspicion that would justify a prolonged detention: "the nervousness of [McNeil], the fact that candles have been known to be involved [in drug] trafficking, and the inconsistencies in the stories."

The trial court erred in finding that there was reasonable articulable suspicion of drug activity to support a continued detention. The trial court relied on the officer's testimony that McNeil was nervous, but "[n]ervousness is not sufficient to justify an investigative detention." *Heard v. State*, 325 Ga. App. 135, 139 (1) (751 SE2d 918) (2013). "Even when other factors are present, nervous behavior of a person who has been stopped by an armed law enforcement officer is not an unusual response and is not necessarily strong evidence to support . . . reasonable suspicion." *Barraco v. State*, 244 Ga. App. 849, 852 (2) (b) (537 SE2d 114) (2000).

With regard to a link between candles and drugs, the sergeant testified that he had personal experience with drugs being concealed inside candles, but he did not testify that this was a common occurrence or a widespread drug trafficking practice. Although the police undoubtedly have found drugs concealed inside candles and a wide variety of other common household objects, candles themselves are legal products that can be used for a legal purpose, and the driver and McNeil gave

14

consistent statements that the driver had a candle-making business. "The inference that all persons [traveling in] cars with [candles] are drug users or dealers is not . . . a rational inference." *Hameen v. State*, 246 Ga. App. 599, 599 (1) (541 SE2d 668) (2000). Hence, the presence of candles and candle wax in the sedan did not justify the sergeant's further detention of the driver and McNeil for suspected drug activity. Accord id. (fact that car had darkly tinted windows did not support a rational inference that the person driving the car was hiding illegal drug activity and thus did not justify detention); *L. B. B., III v. State*, 129 Ga. App. 163, 163 (198 SE2d 895) (1973) (presence in vehicle of "cigarette wrapping paper," a legal product, did not justify detention).

Lastly, inconsistencies in answers to police questions do not give rise to reasonable articulable suspicion unless the inconsistencies in the car occupants' statements are meaningful. See *Migliore v. State*, 240 Ga. App. 783, 786 (525 SE2d 166) (1999). The driver and McNeil both told the sergeant that they had traveled to Atlanta and had come to Georgia for the driver's candle-making business. Given the consistencies in the driver and McNeil's accounts of their travel itinerary, the fact that they gave different times for when they left, without more, "did not provide [the sergeant] with a basis for suspecting [that the driver and McNeil] possessed drugs."

15

*Watts v. State*, 334 Ga. App. 770, 779 (1) (b) (780 SE2d 431) (2015). See *Migliore*, 240 Ga. App. at 786 (concluding that "differing statements regarding . . . the length of time spent at a previous destination" were not "meaningful inconsistencies"). Cf. *Anderson v. State*, 261 Ga. App. 657, 658-659 (583 SE2d 511) (2003) (officer had articulable suspicion for continued detention, where car occupants gave "directly conflicting accounts" regarding where they had traveled); *Jones v. State*, 253 Ga. App. 870, 873 (560 SE2d 749) (2002) (officer had articulable suspicion for continued detention, given that, among other things, car occupants gave "directly conflicting stories" regarding their travel destination).

Accordingly, we conclude that the factors relied upon by the trial court, even when viewed in their totality, were insufficient to show that the sergeant had a reasonable articulable suspicion of illegal drug activity so as to justify the continued detention of the driver and McNeil. Furthermore, "[w]e find that no attenuating circumstances exist[ed] as to the pat-down and seizure of the [drugs from McNeil's person]; [their] seizure clearly was causally connected to the illegal [continued detention]." *State v. Sapp*, 214 Ga. App. 428, 431 (3) (448 SE2d 3) (1994). "[The drug] evidence was discovered by exploitation of the violation of [McNeil's] Fourth Amendment rights and is therefore inadmissible as the fruit of the poisonous tree."

(Citation and punctuation omitted.) *Mullins v. State*, 355 Ga. App. 452, 457 (844 SE2d 519) (2020). Consequently, we reverse the order of the trial court and remand the case with direction to grant McNeil's motion to suppress.[2] See *Weaver*, 357 Ga. App. at 491.

*Judgment reversed. Gobeil and Markle, JJ., concur.*

---

[2] In light of our decision in this case, we need not address McNeil's claim that the pat-down search of his person was unconstitutional because the sergeant did not have a reasonable belief that he was armed and dangerous.